Filed 1/27/21; Certified for Publication 2/18/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| NORRIS MORGAN et al., | B297393 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC695605) |
| v. | |
| J-M MANUFACTURING COMPANY, INC., | |
| Defendant and Appellant. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Maurice A. Leiter, Judge. Affirmed in part, reversed in part.

Manning Gross & Massenburg, John T. Hugo, Carrie S. Lin; Greines, Martin, Stein & Richland, Kent L. Richland, David E. Hackett, and Nadia A. Sarkis for Defendant and Appellant.

Bowman & Brooke and Jennifer T. Persky for Association of Southern California Defense Counsel as Amicus Curiae on behalf of Defendant and Appellant.

Simmons Hanly Conroy, Paul C. Cook, Deborah R. Rosenthal, and William A. Kohlburn for Plaintiff and Respondent.

_____

Norris Morgan was exposed to asbestos at construction jobsites where he worked in the 1970s and 80s.  After he was diagnosed with mesothelioma in December 2017, Morgan and his wife, Lori, sued a number of defendants, including J-M Manufacturing Company (J-MM)—Mr. Morgan for his injuries and Mrs. Morgan for loss of consortium.[1]  By the time trial commenced in October 2018, only J-MM and another defendant, Familian Corp., remained as defendants.  Familian settled with the Morgans during trial, leaving J-MM as the only remaining defendant when the case went to the jury.

The jury concluded that Morgan was exposed to asbestos from products that J-MM sold, and that J-MM was partly (45%) responsible for Morgan's mesothelioma.  The jury awarded the Morgans a total of $15,270,501 in compensatory damages.  The jury also concluded that J-MM had acted with malice, oppression, or fraud, and awarded an additional $15,000,000 as punitive damages.  Based on the jury's apportionment of fault, the trial court entered judgment for the Morgans against J-MM for $22,213,704.39.  J-MM filed motions for judgment

_____

[1] Mr. Morgan passed away on December 12, 2018.  Mrs. Morgan is Mr. Morgan's successor-in-interest in this matter. (Code Civ. Proc., §§ 377.11, 377.30.)

notwithstanding the verdict and new trial, which the trial court denied.

J-MM challenges the trial court's judgment and rulings on three grounds. First, J-MM contends that there is no evidence that Morgan was exposed to pipe supplied by J-MM. As explained below, we disagree with this contention; the record contains evidence from which the jury could reasonably have concluded that Morgan was exposed to asbestos from pipe supplied by J-MM. Second, J-MM contends that the trial court erred when it declined J-MM's request for a jury instruction that J-MM was not liable for the conduct of another company—the Johns-Manville Corporation. We also disagree with this contention; the trial court was not required to give J-MM's requested instruction. Finally, J-MM contends that the jury's punitive damage award is not supported by substantial evidence. We agree with this contention, and will reverse the trial court's award of punitive damages.

## BACKGROUND

One of the businesses of the Johns-Manville Corporation and its related companies (JMC) was manufacturing and selling asbestos-cement pipe—sometimes called transite pipe. A common application of asbestos-cement pipe is to carry water and sewer between water and sewer providers and their customers. JMC declared bankruptcy in the early 1980s, and sold its asbestos-cement pipe business to two companies that began operations on January 1, 1983: J-M A/C Pipe Corporation (J-M A/C), which manufactured asbestos-cement pipe, and J-MM, which sold asbestos-cement pipe that J-M A/C manufactured. Pursuant to a bankruptcy court order, the JMC assets that J-MM acquired were "free of . . . all present and future liabilities . . . and

3

all claims attributable to periods prior to the transfer which relate . . . to personal injury or property damage allegedly attributable to asbestos-fiber . . . ."

The asbestos-cement pipe that J-MM sold after January 1, 1983 was similar to the pipe that JMC sold. According to J-MM, "J-M A/C pipe [that J-MM sold] and [JMC] pipe looked alike. Both were colloquially referred to as 'Transite' and had the same stencil label: 'J-M Transite.' "

Morgan began working in the construction industry in 1972, including as a construction superintendent from 1979 to 1985 for Spriggs and Company (Spriggs) and moved in 1985 to Bumbarger and Associates. Morgan oversaw day-to-day construction activity on jobsites that included retail, industrial, and office buildings.

Among other construction activities, Morgan supervised plumbers installing asbestos-cement water and sewer pipe on his worksites. To install the pipe, Morgan testified, plumbers "would either use a gas or electric saw" to cut the pipe, which "created dust." According to Morgan, each cut took "[a] couple minutes." The plumbers would also bevel the ends of the pipe to make them easier to connect—another process that created dust to which Morgan was exposed. At two to three projects per year from 1979 through 1985, Morgan estimated that he observed 20 to 50 cuts of asbestos-concrete pipe at each project, and then each pipe was beveled on both ends.

Morgan recalled that when he first began working for Spriggs, most of the asbestos-cement pipe came from a company called CertainTeed, "[t]hen later for whatever reasons they— most of my subcontractors went to using J-M Transite pipe." Morgan recalled that he knew the pipe was "J-M Transite"

4

because of the stencil on the side of the pipe and, he testified, from invoices.

The Morgans filed their complaint in the trial court on February 23, 2018.  In it, they alleged seven causes of action covering Mr. Morgan's personal injuries and one cause of action alleging Mrs. Morgan's loss of consortium against more than 20 defendants who had all allegedly supplied asbestos or manufactured or supplied products containing asbestos.  By the time the case was tried in October 2018, all defendants other than J-MM and Familian Corp. had either been dismissed or settled.

The matter was tried to a jury in October and November 2018.  After the parties rested and before closing argument, the Morgans and Familian announced that they had settled.  After the case was submitted to the jury, J-MM filed a motion for a directed verdict arguing, among other things, that plaintiffs had not introduced substantial evidence that Morgan had ever been exposed to asbestos supplied by J-MM or that J-MM had acted with fraud, malice, or oppression, which would be required to support a punitive damage award.  The trial court denied the motion.

The jury returned a verdict in favor of the Morgans against J-MM on November 13, 2018.  Among other findings on a special verdict form, the jury concluded that Mr. Morgan had been "exposed to respirable asbestos from products supplied, distributed, or sold by [J-MM]," that Mr. Morgan had suffered a total of $14,270,501 in compensatory damages and that Mrs. Morgan's loss of consortium damages were $1,000,000, that the fault of Mr. Morgan's injuries were 45 percent attributable to

J-MM, and that J-MM "acted with malice, oppression, or fraud in connection with the conduct which caused [Mr. Morgan's] mesothelioma."

The jury returned on November 15, 2018 for a trial regarding the amount of punitive damages, and based on the evidence it heard awarded Mr. Morgan $15,000,000 in punitive damages.

The trial court reduced the jury's compensatory damage awards based on the jury's allocation of fault and settlement credits to $7,213,704.39. Together with the jury's punitive damage award, the trial court entered judgment for the Morgans against J-MM for $22,213,704.39.

J-MM moved the trial court for judgment notwithstanding the verdict and for a new trial on February 14, 2019. The trial court denied both motions in an order it issued on April 3, 2019.

J-MM filed timely notices of appeal from the judgment and the trial court's order denying the motion for judgment notwithstanding the verdict. (Code Civ. Proc., §§ 904.1, subds. (a)(1), (4), 659; Cal. Rules of Court, rules 8.104(a), 8.108(b).)

## DISCUSSION

J-MM challenges the judgment on three grounds. First, J-MM contends that Morgan presented no evidence that he was exposed to products supplied by J-MM. On that basis, J-MM contends that its actions could not have caused Morgan's mesothelioma, and the judgment should be reversed in its entirety. Second, J-MM points out that it requested the trial court to instruct the jury that J-MM could not be liable for JMC's torts because of the bankruptcy court order referenced in the first paragraph of the background section above; the trial court denied J-MM's request. J-MM argues that Morgan convinced the jury

6

that J-MM was merely a continuation of JMC, and the requested jury instruction would have prevented any confusion.  Finally, J-MM contends that Morgan failed to produce evidence in support of punitive damages sufficient to meet Morgan's burden under Civil Code section 3294, subdivision (b).  We address each of J-MM's arguments in turn.

## A. Morgan's Exposure to J-MM Asbestos-Cement Pipe

Our Supreme Court examined causation in asbestos cases in depth in *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953.  "[U]ncertainty frequently exists," the Supreme Court said, "whether the plaintiff was even exposed to dangerous fibers from a product produced, distributed or installed by a particular defendant."  (*Id.* at p. 975.)  Nevertheless, "plaintiffs [bear] the burden of proof on the issue of exposure to the defendant's product."  (*Ibid.*)  "If there has been no exposure, there is no causation."  (*McGonnell v. Kaiser Gypsum Co., Inc.* (2002) 98 Cal.App.4th 1098, 1103.)

J-MM contends that Morgan has not met that burden here—that there was not substantial evidence adduced at trial that Morgan had ever come into contact with any J-MM product as opposed to a JMC product.  J-MM contends the trial evidence is "equally balanced" that Morgan was exposed to J-MM asbestos-cement pipe as to *JMC* asbestos-cement pipe.  J-MM argues that the trial evidence demonstrates that J-MM only ever sold 13-foot lengths of asbestos-cement pipe, but that Morgan's undisputed testimony was that he had only ever seen 10-foot lengths of "J-M Transite" asbestos-cement pipe.  *JMC* had manufactured 10-foot lengths of "J-M Transite" pipe, the argument goes; so either the uncontested evidence demonstrates that the "J-M Transite" pipe Morgan testified about was *JMC* pipe, or the evidence can only be

7

interpreted as equally balanced—that the pipe could have been *either* J-MM pipe or JMC pipe. Under either of those scenarios, J-MM argues, the jury would have no way to know whether Morgan was exposed to J-MM asbestos-cement pipe.

On appeal from an order denying a motion for judgment notwithstanding the verdict, our standard of review—as was the trial court's standard on the motion—is "whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) We may not reweigh evidence or consider witnesses' credibility. (*In re Coordinated Latex Glove Litigation* (2002) 99 Cal.App.4th 594, 606.) Rather, we view the evidence in the light most favorable to the jury's verdict, we disregard conflicting evidence, and we draw all legitimate inferences in favor of the verdict. (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 192.)

J-MM's argument here rests on its assertion that "[b]oth [JMC] and J-MM sold asbestos cement pipe marked 'J-M Transite.'" "[T]he evidence was undisputed that J-M A/C did *not* manufacture ten-foot pipe," J-MM says, and therefore the pipe Morgan encountered at his jobsites could not have been J-MM pipe.

J-MM based its argument here on inconsistencies between two witnesses' testimony and the parties' assertions that asbestos-cement pipe manufactured by both JMC and J-MM shared the "J-M Transite" stencil marking. J-MM argues that *Garcia v. Joseph Vince Co.* (1978) 84 Cal.App.3d 868 (*Garcia*) demonstrates why a jury could not have made a determination about who was responsible for the "J-M Transite" pipe Morgan saw at his worksites.

8

In *Garcia*, a college student was injured by a fencing opponent using a sabre with a tip, according to one witness, "much thinner than a proper fencing regulation tip." (84 Cal.App.3d at p. 872.) The student who was using the offending sabre and his college had both purchased blades from the same two companies. (*Ibid.*) After the injury, the blade was replaced in the team bag and was mixed up with other blades—from both companies. (*Ibid.*) No witness could identify which company manufactured the blade, and no witness disputed that blades from both companies were present. (*Ibid.*) There was no evidence in the case from which a jury might have distinguished whose sabre caused the plaintiff's injury. (*Id.* at p. 874.)

JMC ceased operations in December 1982 and J-MM began operating on January 1, 1983. This case is distinguishable from *Garcia*. No testimony places both JMC "J-M Transite" pipe and J-MM "J-M Transite" pipe at any of Morgan's worksites at the same time for any but a very narrow window of time. To the contrary, for all of 1983, 1984, 1985, 1986, and whatever time in 1987 Morgan continued to work at Bumbarger, he testified that he continued to be exposed to "J-M Transite" pipe. During all of that time, the evidence establishes that there was only one supplier of "J-M Transite" pipe—J-MM.

J-MM's arguments about the length of the pipe conclusively establishing that it could not have been J-MM pipe is unavailing. J-MM's argument suggests, at best, that Morgan's memory was not flawless regarding the length of pipe he encountered in the mid-1980s and testified about in 2018.

Witnesses are not required to have perfect memories. J-MM's argument concerns Morgan's credibility and the weight the jury might have given his testimony, not its sufficiency as

9

evidence.  (See *Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962, 974.)  It is "the province of the jury to resolve the conflicts in the evidence and to pass upon the weight to be given the evidence.  [Citations.]  It is well settled that the trier of fact may accept part of the testimony of a witness and reject another part even though the latter contradicts the part accepted."  (*Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67; see *Moran v. Foster Wheeler Energy Corp.* (2016) 246 Cal.App.4th 500, 518.)  The jury could have reasonably concluded that Morgan did not recall the length of the pipe he saw, regardless of how confident he was about his memory.  And at the same time, the jury could have reasonably concluded that he recalled seeing "J-M Transite" asbestos-cement pipe on jobsites as late as 1985, 1986, and 1987.

Morgan's testimony is evidence sufficient to support the jury's conclusion that he was exposed to asbestos in products sold or supplied by J-MM.

**B. J-MM's Requested Johns-Manville Jury Instruction**

J-MM's argument suggests, at best, that Morgan's memory was not flawless regarding the length of pipe he encountered in the mid-1980s and testified about in 2018.  JMC filed a petition for reorganization under the Bankruptcy Code in 1982.  (*Green v. Travelers Indemnity Co.* (1986) 185 Cal.App.3d 544, 548.)  In December 1982, the bankruptcy court approved the sale of JMC's asbestos-pipe cement business to J-MM and J-M A/C.  According to the bankruptcy court's order, the J-MM's acquisition of JMC's assets was to be "free of . . . all present and future liabilities . . . and all claims attributable to periods prior to the transfer which relate . . . to personal injury or property damage allegedly attributable to asbestos-fiber . . . ."

10

At trial, J-MM requested the following special jury instruction:

"In this case, the following is true:

"Johns-Manville and J-M Manufacturing Company, Inc. are not the same entity.

"In late 1982, J-M Manufacturing Company, Inc. purchased certain portions of the pipe operations of Johns-Manville and began to do business on January 1, 1983.

"J-M Manufacturing Company, Inc. is not liable to Plaintiffs for any exposure to asbestos as a result of work performed with or around Johns-Manville products before January 1, 1983.

"No other proof is needed and you must accept these facts I have read to you as true in this trial."

The trial court did not give the requested instruction.

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) "The giving of an instruction argumentative in form," however, "is error." (*Slayton v. Wright* (1969) 271 Cal.App.2d 219, 238.) "An instruction that goes too elaborately into the particular facts relied on by one of the parties is an argumentative instruction. *An instruction should state rules of law generally, rather than elaborate matters of evidence.* [Citation.] Any attempt to stress, overemphasize, or unduly make prominent selected portions of the evidence is in violation of the rule that instructions should not focus the jury's

11

attention on particular items of evidence; '[T]he vice in any such instruction is that it unduly emphasizes one portion of the evidence, puts the court in the position of making an argument to the jury, and misleads the jury into thinking that because the court has specifically mentioned certain testimonial facts they are of undue importance or that the court believed them to be true.' " (*Ibid.*, italics added.)

J-MM argues that the proposed instruction was "a neutral recitation regarding the binding impact of a court order on the scope of J-MM's liability." But the trial court pointed out in its order denying J-MM's post-trial motions that "J-MM did not ask the Court to instruct on the elements of successor liability." The trial court viewed the instruction as an "invit[ation] . . . to bolster [J-MM's] closing argument by underscoring certain undisputed facts." Indeed, as the trial court pointed out in its post-trial ruling, J-MM argued at the parties' jury instruction conference that "these are not facts in dispute in any way, shape or form." The trial court responded that "if it is undisputed, then you can argue it. But in the absence of a stipulation, I'm not going to instruct the jury as to particular facts."

We agree with the trial court's analysis. The trial court reasoned that Morgan never raised or argued successor liability, that J-MM did not request an instruction on the elements of successor liability, and that J-MM remained free at all times to draw the distinction for the jury between J-MM and JMC. Refusing to give J-MM's requested special instruction was not error.

Moreover, the special verdict form and the jury's allocation of fault reflect that the jury understood the difference between the two companies and allocated fault accordingly. The questions

regarding J-MM's liability all specifically referred to "J-M Manufacturing Company, Inc.," and never to JMC. And when the jury was asked to allocate fault, it allocated fault to both "Johns Manville"—one percent—and to "J-M Manufacturing Company, Inc."—45 percent. The jury also allocated fault among Morgan—12 percent—and 16 other entities and individuals, including both of the companies for whom Morgan testified he worked when he was exposed to asbestos contained in products that J-MM sold or supplied.

The jury's allocation of fault between J-MM and JMC is consistent with Morgan's testimony regarding his exposure to "J-M Transite" pipe. He testified that early in his time at Spriggs and Company, he was exposed more to asbestos-cement pipe from CertainTeed. *Later* in his time at Spriggs and Company, "most of [Morgan's] subcontractors went to using J-M Transite pipe." From 1979 to 1985, Morgan testified, he "saw mostly CertainTeed and somewhere in the late '70s, don't know why, they got J-dash-M Transite pipe became the pipe of choice, and [he] saw it show up on [his] job sites more and more." At Bumbarger—from 1985 until 1987—Morgan recalled *only* J-M Transite pipe.

"A refusal to instruct the jury is reversible error if it is probable that the error prejudicially affected the verdict." (*Douglas v. Fidelity National Ins. Co.* (2014) 229 Cal.App.4th 392, 408; accord *Soule, supra*, 8 Cal.4th at p. 580.) Based on the jury's specific allocation of fault and its linear correlation with Morgan's testimony regarding the timing and extent of his exposure to J-M Transite pipe, we would find no prejudice even if the trial court had erroneously refused J-MM's special instruction.

13

## C. Exemplary Damages

J-MM contends that the evidence before the jury was insufficient to support the jury's punitive damage award.

"In an action for breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant. [¶] . . . An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." (Civ. Code, § 3294, subds. (a), (b).)

Our review is for sufficiency of the evidence to support the jury's decision to award punitive damages. (*Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 451.) "[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, [we] must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) The clear and convincing evidence standard of proof

" 'requires a finding of high probability' " that the fact is true. (*Id*. at p. 998.)

The primary focus of J-MM's argument is that there is no evidence in the record that a J-MM officer, director, or managing agent authorized or ratified any conduct. J-MM contends that at trial, Morgan "treated J-MM as a monolithic entity" and referred to the company—in its entirety—as "they," without ever identifying who "they" referred to. "[O]f the few J-MM employees whose conduct was specifically identified at trial," J-MM argues, "none even qualified as officers, directors or managing agents of J-MM during the relevant time period."

Morgan does not argue that there is evidence identifying any act of any particular J-MM officer, director, or managing agent. Morgan's argument is that "the entire organization was involved in the acts giving rise to malice," and therefore it need not introduce clear and convincing evidence that any particular officer, director, or managing agent had the requisite state of mind. Morgan's argument relies on and quotes from *Romo v. Ford Motor Co.* (2002) 99 Cal.App.4th 1115 (*Romo*), vacated on other grounds by *Ford Motor Co. v. Romo* (2003) 538 U.S. 1028.

In *Romo*, the court found sufficient evidence to support the jury's punitive damage award. The court could identify no case "in which a series of corporate actions and decisions, such as the design, production, and marketing of an automobile, has been found inadequate to support an award of punitive damages on the basis that the multitude of employees involved in various aspects of the process were not high enough in the corporate chain of command. When the entire organization is involved in the acts that constitute malice, there is no danger a blameless corporation will be punished for bad acts over which it had no

15

control, the primary goal of the 'managing agent' requirement. [Citation.] [¶] There is no requirement that the evidence establish that a particular committee or officer of the corporation acted on a particular date with 'malice.' A corporate defendant cannot shield itself from liability through layers of management committees and the sheer size of the management structure. It is enough if the evidence permits a clear and convincing inference that within the corporate hierarchy authorized persons acted despicably in 'willful and conscious disregard of the rights or safety of others.' " (*Romo*, *supra*, 99 Cal.App.4th at pp. 1140-1141.)

But Morgan only relies on *part* of the *Romo* decision. The *Romo* court went on to explain that a plaintiff can satisfy the "managing agent" requirement "through evidence showing the information in possession of the corporation *and the structure of management decisionmaking that permits an inference that the information in fact moved upward to a point where corporate policy was formulated. These inferences cannot be based merely on speculation*, but they may be established by circumstantial evidence, in accordance with ordinary standards of proof." (*Romo*, *supra*, 99 Cal.App.4th at p. 1141, italics added.) The court explained that "[i]t is difficult to imagine how corporate malice could be showing in the case of a large corporation *except by piecing together knowledge and acts of the corporation's multitude of managing agents.*" (*Ibid.*)

It *may* be that J-MM's officers, directors, and managing agents acted with the requisite state of mind to support an award of punitive damages in an appropriate case. A plaintiff *may* be able to provide evidence at trial to "piec[e] together knowledge

16

and acts of [J-MM's] multitude of managing agents." But that did not happen *here*.

That the defendant is a large company does not relax a plaintiff's burden of proof to the point Morgan argues here. We have reviewed the record for evidence from which the jury could have concluded that an officer, director, or managing agent—someone responsible for J-MM's corporate policy—had the requisite state of mind to support a punitive damage award. We found none.

## DISPOSITION

The judgment is reversed with respect to the jury's punitive damage award. On remand, the trial court will vacate its judgment and enter judgment consistent with this opinion. The trial court's judgment is affirmed in all other respects. The parties will bear their own costs on appeal.

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

FEDERMAN, J.*

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 2/18/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| NORRIS MORGAN et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>J-M MANUFACTURING COMPANY, INC.,<br><br>    Defendant and Appellant. | B297393<br>(Los Angeles County<br>Super. Ct. No. BC695605)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

    The opinion in the above-entitled matter filed on January 27, 2021, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

    There is no change in judgment.

_____

ROTHSCHILD, P. J.      CHANEY, J.      FEDERMAN, J.*

_____

    * Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.